UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SEAGRAPE INVESTORS LLC,

                    Plaintiff,

v.

KALEIL ISAZA TUZMAN; MICHAEL
SINGER; THE SINGER 1995 FAMILY
TRUST; INNOCREATIVE CAPITAL, LLC;
KIT CAPITAL (NEVIS) LLC; OBRA PIA
LTD.; OBRA PIA (U.S.) FEEDER, LP;
OBRA PIA MANAGEMENT, GP, LTD.; and
OBRA PIA LTD., SURCUSAL
COLOMBIA,

                    Defendants.

No. 21-CV-7517 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

On September 8, 2021, Plaintiff Seagrape Investors LLC ("Seagrape") filed suit in connection with a luxury hotel development project (the "Project") against two groups of individuals and entities: the "OP Defendants"—Defendants Kaleil Isaza Tuzman; KIT Capital (Nevis) LLC ("KIT Capital"); Obra Pia Ltd. ("Obra Pia"); Obra Pia (U.S.) Feeder, LP ("OP U.S. Feeder"); Obra Pia Management, GP, Ltd. ("OP Management"); and Obra Pia Ltd., Surcusal Colombia ("OP Colombia")—and the "Singer Defendants"—Defendants Michael Singer; the Singer 1995 Family Trust ("Singer Trust"); and Innocreative Capital, LLC ("Innocreative"). In its First Amended Complaint (the "Complaint"), Seagrape asserts (1) a demand for the books and records of the OP Defendants, save Tuzman and KIT Capital, as well as claims for (2) breach of contract against the OP Defendants; (3) tortious interference with contract against the Singer Defendants; (4) actual and constructive fraudulent transfer against all defendants, *see* N.Y. Debt. & Cred. §§ 273, 276 (repealed Dec. 6, 2019); and (5) malicious prosecution against all defendants.

Before the Court is Defendants' motion to dismiss. In particular, Seagrape moves under Rule 12(b)(2) to dismiss the Complaint as to Singer and the Singer Trust for lack of personal jurisdiction and to dismiss it in its entirety under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons that follow, Defendants' motion is granted in part and denied in part. Only the following claims may proceed:

- The breach of contract claim against all OP Defendants, except OP U.S. Feeder;

- The tortious interference with contract claim against all Singer Defendants;

- The actual fraudulent conveyance claim against Obra Pia, OP U.S. Feeder, Innocreative, and the Singer Trust, as well the corresponding claim for attorneys' fees;

- The constructive fraudulent conveyance claim against Obra Pia; and

- The malicious prosecution claim against the OP Defendants, except OP Colombia and OP Management.

## BACKGROUND[1]

### I. Factual History

About a decade ago, Seagrape invested in and loaned money to a limited partnership, OP U.S. Feeder, in connection with a luxury hotel development project in Cartagena, Colombia. *See* Complaint ¶¶ 32–37, Dkt. 59. Kaleil Tuzman, Obra Pia, and KIT Capital agreed to guarantee the

---

[1] The Court draws the facts in this section from the Complaint, documents appended to it, or incorporated into it by reference. *See Khan v. Yale Univ.*, 27 F.4th 805, 810 (2d Cir. 2022), *certified question answered*, 295 A.3d 855 (Conn. 2023). The Court also relies on the declarations and exhibits in support of Defendants' motion to dismiss as the facts pertain to personal jurisdiction. *See Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 245 n.1 (S.D.N.Y. 2020).

Many of Seagrape's allegations about various agreements and legal proceedings ambiguously refer to the OP Defendants without differentiating between them. *See, e.g.*, Complaint ¶¶ 2, 4–6, 80, 87. The same is true with respect to the Singer Defendants. *See, e.g.*, id. ¶ 3, 98. Not all the OP or Singer Defendants, however, are parties to each agreement or suit referenced in the Complaint. This section specifies the relevant defendants where Seagrape's reference to the "OP Defendants" or "Singer Defendants" as a group is inconsistent with the agreements or legal proceedings referenced in the Complaint. *See Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016).

loan, *id*. ¶ 34,[2] but Seagrape soon found its investment and loan at risk when Tuzman was indicted

for fraud in 2015, *id*. ¶¶ 39, 43.

"In view of the circumstances, Tuzman agreed to seek out a third-party [to] . . . purchase

the Project," *id*. ¶ 43, and a potential buyer signed a letter of intent on August 23, 2016, *id*. ¶ 44.

"To facilitate" the deal, Seagrape entered into a credit security acknowledgement (the "CSA") with

Tuzman, Obra Pia, KIT Capital, OP Management, and OP Colombia (together, the "Debtors") on

August 25, 2016.[3] *Id*. ¶¶ 46–47. Through the CSA, Seagrape agreed to forebear from foreclosing

on the Project until a later date, which would enable to the potential buyer to complete the

transaction. *Id*. ¶ 47. The Debtors, in return, agreed to pay Seagrape $4.7 million (the "Cash

Amount Due"), with interest, and granted it a first-degree mortgage on the Project. *Id*. ¶¶ 48, 51.

According to Seagrape, the Debtors further agreed, under Sections 5 and 6 of the CSA, "not [to]

provide any third party with a security interest in the Project—or otherwise modify or impair

Seagrape's interest in [it] without [Seagrape's] written consent"—unless they first paid Seagrape

the Cash Amount Due. *Id*. ¶ 51. Seagrape and the Debtors also agreed to litigate "any . . . claim

relating to" the CSA in New York. Complaint, ex. 4 at 4. Section 12 of the CSA contained the

following forum selection clause:

> With respect to *any* dispute, controversy or *claim relating to*, connected with or
> arising out of *this Agreement*, each Party thereby . . . irrevocably *submits to the*
> *jurisdiction of any* New York State or *federal court sitting in the Borough of*
> *Manhattan in the City of New York, NY, USA*.

*Id*. (emphases added).

---

[2] Tuzman owns 100 percent of KIT Capital. Complaint ¶ 13.

[3] KIT Capital owns 100 percent of OP Management, Complaint ¶ 16, and Obra Pia owns 100 percent of OP Colombia,
*id*. ¶17.

Ultimately, "Tuzman failed to [timely] close" the sale of the Project, Complaint ¶ 60, and Seagrape began the foreclosure process, *id*. ¶ 61. "[B]y letter dated April 27, 2017," Seagrape provided the potential buyer with written notice "of its intent to declare default under the CSA and to proceed enforcing all of its rights." *Id*. In addition, in November 2017, Seagrape initiated proceedings before the Colombian equivalent of the U.S. Securities and Exchange Commission, requesting that it "investigate irregularities at [OP Colombia], including [its] failure to properly record the Cash Amount Due." *Id*. ¶ 62. More than a year later, on January 21, 2019, Seagrape served on Obra Pia a statutory demand for payment of $5.1 million. *Id*. ¶ 63. In response, Obra Pia initiated legal action in the British Virgin Islands, seeking to set aside Seagrape's statutory demand. *Id*. ¶ 73. The British Virgin Islands Court set aside Seagrape's demand on the condition that Obra Pia pursue its claims in New York. *Id*. ¶ 78; Tuzman Declaration, exs. 8–9, Dkt. 63.

Accordingly, on June 24, 2019, Obra Pia, OP U.S. Feeder, Tuzman, and KIT Capital (the "*Obra Pia* Plaintiffs") filed suit against Seagrape in New York, asserting numerous claims, including for breach of contract. *Id*. ¶ 79; *Obra Pia* Complaint, *Obra Pia Ltd. v. Seagrape Investors LLC*, No. 19-CV-7840 (S.D.N.Y. Aug. 21, 2019), Dkt. 1. In that suit, the *Obra Pia* Plaintiffs initially alleged that Seagrape breached numerous agreements, including the CSA. *Obra Pia* Complaint ¶¶ 17, 73–79. As the litigation progressed, they narrowed their contract claim to focus on a subordination agreement (the "Subordination Agreement"). *Obra Pia* Amended Complaint ¶¶ 185–92, *Obra Pia Ltd. v. Seagrape Investors LLC*, No. 19-CV-7840 (S.D.N.Y. Sept. 18, 2019), Dkt. 19. Seagrape asserts that the aim of the suit—initiated and continued under false premises— was "to block" Obra Pia's liquidation and Seagrape's recovery. Complaint ¶ 79. According to Seagrape, the *Obra Pia* Plaintiffs initiated suit under the false premise that Seagrape had not

provided written notice before issuing its statutory demand and then continued the suit under another false premise—that the Subordination Agreement remained in effect. *Id*. ¶¶ 129, 133.

By Seagrape's account, the *Obra Pia* Plaintiffs did not act alone. Innocreative allegedly loaned Obra Pia money (the "First Litigation Loan") before the British Virgin Islands proceeding began. *Id*. ¶ 65. In exchange, Obra Pia agreed, among other things, to pay Innocreative a "guaranteed return" of two times the loan amount and a proportion of any damages received. *Id*. ¶ 68. The *Obra Pia* Plaintiffs, moreover, allegedly filed suit in New York with the Singer Defendants' "funding and direction." *Id*. ¶ 129. The Singer Trust allegedly loaned Obra Pia money (the "Second Litigation Loan") shortly before the *Obra Pia* Plaintiffs filed suit in New York.[4] *Id*. ¶ 82. (The Singer Trust later assigned the loan to Innocreative. *Id*.) The Singer Defendants purportedly "select[ed] the OP Defendants' counsel and approv[ed] and pa[id] all legal bills." *Id*. ¶ 130. Singer, meanwhile, allegedly "(a) participated in litigation strategy; (b) referred [Obra Pia] its choice of counsel, [MR]; and (c) reviewed, approved and paid bills submitted by MR to the OP Defendants."[5] *Id*. ¶ 71. On October 9, 2019, Seagrape moved to dismiss the *Obra Pia* Plaintiffs' amended complaint, which this Court ultimately granted in September 2020. *Obra Pia Ltd. v. Seagrape Investors LLC*, No. 19-CV-7840, 2020 WL 5751195, at *19 (S.D.N.Y. Sept. 25, 2020).

In the interim, Obra Pia and OP U.S. Feeder entered into an agreement (the "First Amendment") with Innocreative on October 13, 2019—allegedly at the "behest" of the Singer Defendants. Complaint ¶¶ 5, 90, 100; Tuzman Declaration, ex. 5. Through the First Amendment— which purportedly incorporated the debts from the First Litigation Loan—Obra Pia and OP U.S. Feeder allegedly granted Innocreative a $5 million first lien on the Project. Complaint ¶¶ 5, 95, 98,

---

[4] The Singer Trust is a member of Innocreative. *Id.* ¶ 12.

[5] Singer is a managing member of Innocreative and a trustee of the Singer Trust. *Id.* ¶¶ 10–11.

100; Tuzman Declaration, ex. 5 at 2, 4. Innocreative, in turn, agreed to loan up to $5 million to Obra Pia, which issued an accompanying promissory note (the "Credit Line Note") to Innocreative for up to that amount. Tuzman Declaration, ex. 5 at 3, 4; *id*. ex. 6 at 1–2. The OP Defendants supposedly also issued a further $5 million secured promissory note (the "Colombian Pagare") to Innocreative, "which [it] . . . perfect[ed] . . . as a first mortgage against the Project." Complaint ¶ 100.

Seagrape maintains that a "primary purpose" of the new loan was "to enable Innocreative to continue funding frivolous litigation against Seagrape." *Id*. ¶ 90. In addition, the parties allegedly entered into the First Amendment and Credit Line Note (as well as the Litigation Loans) "with the actual intent to hinder, delay and defraud Seagrape's recovery of the Cash Amount Due under the CSA." *Id*. ¶ 122. The alleged goal was "to encumber [Obra Pia]" with debt that "consume[d] all or nearly all of the equity in the Project, so that none would be available to satisfy" the debt owed to Seagrape. *Id*. ¶ 90.

Seagrape further maintains that the OP Defendants breached Sections 5 and 6 of the CSA by virtue of the First Amendment, Credit Line Note, and Colombian Pagare. *Id*. ¶¶ 111–12. The agreements and notes allegedly "provide[d] a[] third party with a security interest in the Project"— "or otherwise modif[ied] or impair[ed] Seagrape's interest in [it]"—without Seagrape's written consent or its receipt of the Cash Amount Due. *Id*. ¶ 51. All the while, the Singer Defendants were allegedly aware of the terms of the CSA because they had received copies of it. *Id*. ¶¶ 91–92.

This time, Seagrape filed suit in New York. Days after the First Amendment and Credit Line Note were executed, Seagrape initiated an action against the OP Defendants ("*Seagrape I*") in New York, asserting a series of claims, including a breach of contract claim based on several theories. *Seagrape I* Complaint, *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736 (S.D.N.Y. Oct.

22, 2019), Dkt 1. The OP Defendants filed a motion to dismiss Seagrape's complaint, and this Court granted that motion in part and denied it in part. *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736, 2020 WL 5751232, at *1 (S.D.N.Y. Sept. 25, 2020). It concluded that Seagrape had not plausibly alleged that the OP Defendants breached Section 6 of the CSA "by engaging in a restructuring of the Project, including [through] the injection of new capital, without [Seagrape's] prior notice and consent." *Id*. at *19. It nonetheless permitted the breach of contract claim to proceed on the theory that the OP Defendants had failed to pay the Cash Amount Due.

Seagrape then filed a motion for summary judgment on the breach of contract claim. In briefing its motion, Seagrape asked the Court to revive its breach of contract claim arising from Section 6 of the CSA and the restructuring of the Project. Reply Memorandum of Law at 6, *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736 (S.D.N.Y. June 25, 2021), Dkt. 144. It argued that the OP Defendants breached Section 6 of the CSA specifically by issuing the Credit Line Note. *Id*. The Court declined to revive the claim, explaining that Seagrape's request was "not appropriate in a reply brief on a motion for summary judgment" and that revival was not "warranted." Transcript 28:1–3, *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736 (Sept. 23, 2022), Dkt. 170.

The Court ultimately granted a renewed motion for summary judgment, awarding Seagrape the Cash Amount Due and attorneys' fees and costs. *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736, 2023 WL 4764022, at *5 (S.D.N.Y. July 26, 2023). It ruled, however, that Seagrape's right to repayment from Obra Pia—but not the other OP Defendants—remained subordinated under the Subordination Agreement. *Id*. In doing so, it found that that the $5 million Credit Line Note had replaced a $1.5 million "bridge loan." *Id*. at 3. It also rejected any argument that the First Amendment was invalid on the basis that Seagrape had not agreed to subordinate its due repayment

to Innocreative's due repayment, reasoning that the "plain terms of the Subordination Agreement" permitted the modification of the "bridge loan." *Id*. at 3; *see id.* at 3 n.4.

## II. Procedural History

Seagrape filed this action on September 8, 2021, after the Court had dismissed all but the breach of contract claim in *Seagrape I*, but before it had granted summary judgment for Seagrape on that claim. In this Complaint, Seagrape asserts (1) a demand for the books and records of the OP Defendants, save Tuzman and KIT Capital, as well as claims for (2) breach of contract against the OP Defendants; (3) tortious interference with contract against the Singer Defendants; (4) actual and constructive fraudulent conveyance against all defendants, *see* N.Y. Debt. & Cred. §§ 273, 276 (repealed Dec. 6, 2019); and (5) malicious prosecution against all defendants. Before the Court is Defendants' motion to dismiss the amended complaint. In particular, Defendants move under Rule 12(b)(2) to dismiss the complaint as to Singer and the Singer Trust for lack of personal jurisdiction. They also seeks to dismiss the complaint in its entirety under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## DISCUSSION

The parties regrettably failed to brief many of the issues relevant to this case, making the Court's job significantly harder. Nonetheless, the Court begins with the contention that it cannot exercise personal jurisdiction over Singer and the Singer Trust, followed by the argument that Seagrape fails to plausibly state any claim.[6]

---

[6] Defendants also move to strike Seagrape's amended complaint, arguing that Seagrape failed to comply with (1) the time requirements set forth by Federal Rule of Civil Procedure 15(a) and (2) the notice requirement set forth by Individual Rule 4(c) of this Court's Individual Rules and Practices. The motion is denied.

Rule 15(a)(1)(B) provides that "[a] party may amend its pleading once as a matter of course no later than . . . 21 days after service of a motion under Rule 12(b), (e), or (f)." Fed. R. Civ. P. 15(a)(1)(B). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave," which "the court should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Defendants filed their original motion to dismiss under Rule 12(b) on November 12, 2021. Seagrape did not file an amended complaint within 21 days of that filing. The

## I. Rule 12(b)(2) Motion

To defeat a motion to dismiss under Rule 12(b)(2), a plaintiff "must make a *prima facie* showing that [personal] jurisdiction exists," *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010), and must do so "with respect to each claim asserted," *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).[7] This *prima facie* showing requires "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). The Court "construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiffs" in determining whether a plaintiff has made the requisite showing. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

In a diversity action such as this, courts typically assess whether they may exercise personal jurisdiction by conducting a two-part analysis. *See Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). "[T]he court . . . look[s] first to the long-arm statute of the forum state, in this instance, New York." *Id.* "If the exercise of jurisdiction is appropriate under that statute, the court

---

Court later denied Defendants' original motion to dismiss without prejudice, and, after a deadline extension, Defendants filed a second motion to dismiss on October 13, 2023. Seagrape then filed its first amended complaint on October 27, 2023, less than 21 days after Defendants filed their second motion to dismiss. Unless, as some courts have observed, the 21-day period runs from the "earliest served" motion to dismiss, *see, e.g.*, *Williams v. Black Ent. Television, Inc.*, No. 13-CV-1459, 2014 WL 585419, at *4 (E.D.N.Y. Feb. 14, 2014), Seagrape complied with Federal Rule 15(a)(1)(B). Even if it did not, the Court *sua sponte* grants leave to amend *nunc pro tunc*, finding the absence of "undue delay, bad faith or dilatory motive on the part of [Seagrape], and [the lack of] undue prejudice to [Defendants]." *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 46 (2d Cir. 1983). In so finding, the Court observes that no discovery has yet taken place and that confusion likely resulted when—21 days after the original motion to dismiss was filed—the Court extended Seagrape's time for filing an opposition. Dkt. 41.

Seagrape concedes, *see* Pl.'s Opp'n at 3, that it failed to comply with the notice requirement set forth by the Court's Individual Rule 4(c), which provides: "When a motion to dismiss is filed, the non-moving party must, within fourteen (14) days of receipt of the motion, notify the Court and its adversary in writing [if] . . . it intends to file an amended pleading and when it shall do so," Individual Rule 4(c). Individual Rule 4(c), however, "does not alter the time to file," *id.*, an amended complaint, and the Court exercises its "discretion to waive compliance with its Individual Practices," *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 784 n.2 (S.D.N.Y. 2020). Defendants' motion to strike Seagrape's amended complaint is thus denied.

[7] Unless otherwise indicated, this opinion and order omits all internal quotation marks, citations, footnotes, omissions, emphases, and alterations in quoted text.

then must decide whether such exercise comports with the requisites of due process." *Id*. If, however, a defendant is party to "an agreement contain[ing] a valid an[d] enforceable forum selection clause" whose "scope" covers the claim, the court may dispense with this analysis. *See Yak v. BiggerPockets*, L.L.C., No. 20-3498, 2022 WL 67740, at *1 (2d Cir. Jan. 7, 2022) (summary order); *see Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 87–88 (2d Cir. 2023). Entry into an agreement with such a clause evinces the defendant's "consent to personal jurisdiction." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006).

Defendants argue that Singer and the Singer Trust neither (1) consented to personal jurisdiction nor (2) engaged in the business or tortious conduct necessary for the exercise of specific jurisdiction under New York's long-arm statute, New York Civil Practice Law and Rules § 302(a). The Court concludes that Singer and the Singer Trust consented to the exercise of personal jurisdiction through the CSA's forum selection clause.

### A.  Scope of the Forum Selection Clause

As a threshold matter, Seagrape's tort claims for tortious interference with contract, fraudulent conveyance, and malicious prosecution fall within the "scope" of the CSA's forum selection clause. *Yak*, 2022 WL 67740, at *1; *see In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir.), *certified question accepted sub nom. Thelen LLP. v. Seyfarth Shaw LLP*, 4 N.E.3d 359 (N.Y. 2013), *and certified question answered*, 20 N.E.3d 264 (N.Y. 2014) (characterizing fraudulent conveyance as a tort claim); *Cruden v. Bank of New York*, 957 F.2d 961, 974 (2d Cir. 1992) (same). Section 12 of the CSA provides:

> With respect to *any* dispute, controversy or *claim relating to*, connected with or arising out of *this Agreement*, each Party thereby . . . irrevocably *submits to the jurisdiction of any* New York State or *federal court sitting in the Borough of Manhattan in the City of New York, NY, USA*.

Complaint, ex. 4 at 4 (emphases added). This "broadly worded" provision "is not limited solely to claims for breach of the contract that contains it." *Cognizant Tech. Sols. Corp. v. Bohrer PLLC*, No. 21-CV-5340, 2022 WL 1720319, at *5 (S.D.N.Y. May 27, 2022). It includes any claims "relat[ed] to" the CSA. Complaint, ex. 4 at 4. Furthermore, the Second Circuit has observed that "[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims *relates to* interpretation of the contract." *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 724 (2d Cir. 2013) (emphasis added); *see KnowYourMeme.com Network, Inc. v. Nizri*, No. 22-1322, 2023 WL 6619165, at *1 (2d Cir. Oct. 11, 2023) (summary order); *Cognizant Tech. Sols. Corp. v. Bohrer PLLC*, No. 21-CV-5340, 2022 WL 1720319, at *5 (S.D.N.Y. May 27, 2022). A claim whose "resolution . . . relates to the interpretation of the" CSA, *Magi XXI, Inc.*, 714 F.3d at 724, is undoubtedly "relat[ed] to" the CSA, Complaint, ex. 4 at 4.

Resolution of Seagrape's claim for tortious interference with contract "relates to the interpretation" of the CSA. *Magi XXI, Inc.*, 714 F.3d at 724. To succeed on a tortious interference claim, a plaintiff must establish the "defendant's intentional procurement of the third-party's breach of the contract without justification." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 343 (2d Cir. 2024). The claim thus assumes the existence of a contract. *See RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, No. 22-CV-7996, 2024 WL 1574026, at *5 (S.D.N.Y. Apr. 11, 2024); *cf. KnowYourMeme.com Network, Inc*, 2023 WL 6619165, at *2 (observing that an interference with contractual relationship claim "assume[s] the existence of an enforceable agreement). Seagrape alleges that the Singer Defendants—Singer, the Singer Trust, and Innocreative—"intentionally procured" the OP Defendants' breach of Sections 5 and 6 of the CSA. Complaint ¶ 117. Whether the Court interprets the CSA to have prohibited the OP Defendants' conduct thus bears on whether Singer and the Singer Trust induced a breach. Stated differently, if

the OP Defendants did not violate the CSA, neither Singer nor the Singer Trust could have tortiously interfered with the CSA.

Similar logic applies to Seagrape's fraudulent conveyance claims. Although fraudulent conveyance claims do not always assume the existence of a contract, the ones here do. The alleged fraudulent transfers here "implicated [Seagrape's] contractual rights," *id.*, in that they purportedly prevented Seagrape from "recover[ing] . . . the Cash Amount Due *under the CSA*," Complaint ¶ 122 (emphasis added). Thus, whether the Court interprets the CSA to provide the right to recovery of the Cash Amount Due bears on whether Seagrape's fraudulent conveyance claims survive. In other words, if the CSA did not entitle Seagrape to recover the Cash Amount Due, the central theory under which Seagrape pursues its fraudulent conveyance claims would fail.

Resolution of Seagrape's malicious prosecution claim likewise "relates to interpretation of the contract." *Magi XXI, Inc.*, 714 F.3d at 724. To prevail on a malicious prosecution claim, a plaintiff must demonstrate that the defendant initiated or continued an action without probable cause to believe it could succeed. *See Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002); *Engel v. CBS, Inc.*, 145 F.3d 499, 502 (2d Cir.), *certified question accepted*, 700 N.E.2d 310 (N.Y. 1998), *and certified question answered*, 711 N.E.2d 626 (N.Y. 1999); *see Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004). Seagrape sues Defendants for malicious prosecution based on the *Obra Pia* Plaintiffs' June 2019 suit against it. The *Obra Pia* Plaintiffs initially alleged a breach of the CSA. *Obra Pia* Complaint ¶¶ 73–79. Without interpreting the CSA, the Court would be hard pressed to determine whether the OP Defendants had probable cause to believe that their claim for breach of contract—namely, the CSA—could succeed. *See Fulton*, 289 F.3d at 195.

The CSA's forum selection clause thus covers Seagrape's claims for tortious interference with contract, fraudulent conveyance, and malicious prosecution.

### B. Validity and Enforceability of the Forum Selection Clause

The next question is whether the forum selection clause is valid and enforceable against Singer and the Singer Trust even though neither signed the CSA. The Court concludes it is.

"[F]orum selection clauses are *prima facie* valid and should be enforced unless" "the . . . clause [is] invalid for such reasons as fraud or overreaching" or "enforcement is shown . . . to be unreasonable under the circumstances." *Magi XXI, Inc.*, 714 F.3d at 720–21. Crediting Seagrape's "averment of facts," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673, the Court finds no reason why the CSA's forum selection clause would be invalid or "unreasonable under the circumstances," *Magi XXI, Inc.*, 714 F.3d at 720–21.

Nor does the Court conclude that the clause is unenforceable against Singer or the Singer Trust as non-signatories. "[T]he fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause." *Aguas Lenders Recovery Group v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009). This rule "prevent[s] parties to contracts from using evasive, formalistic means . . . to escape contractual obligations." *Magi XXI, Inc.*, 714 F.3d at 722. Courts "have [thus] permitted non-signatories . . . to be bound by . . . forum selection clauses where, under the circumstances, the non-signatories enjoyed a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound." *Fasano v. Li*, 47 F.4th 91, 103 (2d Cir. 2022).

In *Aguas Lenders*, the Second Circuit identified several such circumstances, including those where a non-signatory is "closely related" to a signatory. 585 F.3d at 701; *see Fasano*, 47 F.4th at 103. Courts in this circuit have found that a non-signatory is "closely related" to a signatory where the former allegedly acted "in concert with the signatory." *Cognizant Tech. Sols. Corp*, 2022 WL 1720319, at *4; *see also RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, No. 22-CV-7996, 2024

13

WL 1574026, at *4 (S.D.N.Y. Apr. 11, 2024) (collecting cases). Whether non-signatories are aware of the terms of a contract may also bear on whether the "non-signatories enjoyed a sufficiently close nexus . . . such that it was foreseeable that they would be bound." *Fasano*, 47 F.4th at 103; *see also NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 351 (S.D.N.Y. 2020) (reasoning that it would "be difficult to conclude that it was reasonably foreseeable to [the non-signatories] that they would be bound by such a forum selection clause" where they did not learn of the relevant contract until litigation).

Seagrape alleges that Singer and the Singer Trust acted "in concert with . . . signatories" to the CSA, albeit by different words. *Cognizant Tech. Sols. Corp.*, 2022 WL 1720319, at *4. Regarding Seagrape's tortious interference claim, Seagrape asserts that Singer and the Singer Trust "[i]nduce[d]," Complaint at 20, and "intentionally procured," *id.* ¶ 117, the OP Defendants' breach. *See also id.* ¶¶ 5, 101. Obra Pia allegedly entered into the First Amendment and issued the Credit Line Note at the alleged "behest" of Singer and the Singer Trust. *Id.* ¶¶ 5, 90, 100.

That they allegedly did so at the "behest" of Singer and the Singer Trust is also relevant to whether Seagrape may enforce the forum selection clause against them as to its fraudulent conveyance claims. *Id.* As discussed below, Seagrape claims that Obra Pia fraudulently conveyed property to Innocreative through the First Amendment. If Obra Pia entered the First Amendment or issued the Credit Line Note at the "behest" of Singer and the Singer Trust, *id.*, it follows that they acted "in concert with [it]," *Cognizant Tech. Sols. Corp.*, 2022 WL 1720319, at *4. Relatedly, all the defendants allegedly worked together "to siphon off all or nearly all of the equity in the Project" through the First Amendment so that "little or no remaining equity" could satisfy Seagrape's claims. Complaint ¶ 124.

Seagrape further alleges that Singer and the Singer Trust acted "in concert with . . . signatories" to the CSA by maliciously prosecuting it. *Cognizant Tech. Sols. Corp.*, 2022 WL 1720319, at *4. The *Obra Pia* Plaintiffs allegedly filed suit in New York with Singer and the Singer Trust's "funding and direction." Complaint ¶ 129. The Singer Trust allegedly loaned Obra Pia money through the Second Litigation Loan shortly before the *Obra Pia* Plaintiffs filed suit. Singer and the Singer Trust also purportedly "select[ed] the OP Defendants' counsel and approv[ed] and pa[id] all legal bills." *Id*. ¶ 130. Singer, in particular, allegedly "(a) participated in litigation strategy; (b) referred [Obra Pia] its choice of counsel, [MR]; and (c) reviewed, approved and paid bills submitted by MR to the OP Defendants." *Id*. ¶ 71.

Finally, not only were Singer and the Singer Trust allegedly engaged in all the conduct described above, they were also purportedly aware of the terms of the CSA because they had received copies of it. Complaint ¶ 91. That Singer and the Singer Trust allegedly acted "in concert" with the signatories to the CSA while aware of its terms makes "it . . . foreseeable that [Singer and the Singer Trust] would be bound" by it. *Fasano*, 47 F.4th at 103; *NuMSP, LLC*, 462 F. Supp. 3d at 351.

In short, the Court may exercise personal jurisdiction over Singer and the Singer Trust because the CSA's forum selection clause covers the relevant claims and is valid and enforceable against them.

## II.  Rule 12(b)(6) Motion

Although the Court may exercise personal jurisdiction over Singer and the Singer Trust, not all the claims against them survive under Rule 12(b)(6). The same is true as to claims against Innocreative and the OP Defendants.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether a plaintiff has done so, a court may consider only the "facts stated on the face of the complaint, . . . documents appended to [it] or incorporated in [it] by reference, and . . . matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991); *see also Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) ("A complaint is also deemed to include . . . documents that, although not incorporated by reference, are integral to the complaint."). Moreover, the court must "accept as true all factual allegations and draw from them all reasonable inferences." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020). It need not, however, "credit conclusory allegations or legal conclusions couched as factual . . . allegations." *Id.* "Accordingly, 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

The Court takes each of Seagrape's claims in turn.

### A.  Demand for Books and Records

Seagrape first asserts a demand for the books and records of the OP Defendants, save Tuzman and KIT Capital. Its demand principally relies on two allegations—first, that OP U.S. Feeder's Limited Partnership Agreement entitles it to OP U.S. Feeder's and OP Management's books and records; and second, that certain agreements, as well as the laws of the British Virgin

Islands and Colombia, entitle it to Obra Pia's and OP Colombia's books and records. Complaint ¶¶ 108–09.

Defendants argue that Seagrape fails to state a plausible claim regarding OP U.S. Feeder's and OP Management's books and records because (1) the Limited Partnership Agreement does not cover OP Management's books and records and (2) Seagrape fails to allege a breach of the Limited Partnership Agreement.[8] As to Obra Pia's and OP Colombia's books and records, Defendants argue that no provision of the agreements identified provides Seagrape a right to inspection. More generally, Defendants argue that Seagrape's demand for books and records is an improper effort to seek discovery in aid of its prior judgment.

While Defendants' observation about discovery may well be true, the problem with the demand for books and records is more fundamental: Seagrape fails to establish the constitutional standing necessary to pursue its claim.

Constitutional "standing is an essential and unchanging part of the case-or-controversy requirement of Article III" of the Constitution. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Without it, "a court has no subject matter jurisdiction to hear the merits of a plaintiff's . . . claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. MerckMedco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). A court may thus raise the issue of standing *sua sponte*, as it does here. *See id.*

To establish standing, a plaintiff must prove by a preponderance of the evidence that it (1) "suffered or [is] imminently threatened with a concrete and particularized injury in fact" (2) "that is fairly traceable to the challenged action of the defendant" and (3) "likely to be redressed by a

---

[8] Defendants also argue that the Court cannot exercise personal jurisdiction over OP U.S. Feeder or OP Management as to Seagrape's demand for books and records. Because the Court concludes that Seagrape lacks the constitutional standing necessary to demand OP Management's and OP U.S. Feeder's books and records, it need not address this argument.

favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014); *see Marakova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "[A] plaintiff," moreover, "must demonstrate standing for *each* claim [it] seeks to press." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 335 (2006) (emphasis added). "Thus, *with respect to each asserted claim,* '[a] plaintiff must always have suffered a distinct and palpable injury to [it]self.'" *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (quoting *Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 100 (1979)).

Seagrape's claim fails at least as to the first element necessary for standing as it alleges no injury related to its "demand for books and records." It does not, for example, allege that Defendants refused to permit it to inspect the books and records, thereby denying it a contractual right. *See, e.g.*, *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, No. 17-CV-307, 2021 WL 4460547, at *15 (S.D.N.Y. Sept. 29, 2021), *amended*, No. 17-CV-307, 2021 WL 4710787 (S.D.N.Y. Oct. 7, 2021) (concluding that the plaintiff plausibly alleged a books and records claim where a defendant allegedly refused to comply with its contractual obligation to allow an inspection); *Mason Tenders Dist. Council Welfare Fund v. F.E.S./M&V Contracting Corp.*, No. 94-CV-4750, 1996 WL 22972, at *1 (S.D.N.Y. Jan. 23, 1996) (ordering defendants to permit the inspection of books and records after plaintiffs had been denied their contractual right to do so). Indeed, Seagrape does not even allege that it ever sought to inspect any books and records. It claims only that it has the right to inspection.

To be sure, Seagrape does allege that it requested that Colombian officials investigate whether OP Colombia failed to properly record the Cash Amount Due on its balance sheet. Complaint ¶ 62. But there is no allegation that any such a failure injured Seagrape in any way. *Cf. Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 (2d Cir. 2021) (concluding that

plaintiffs lacked standing where a bank failed to timely record the satisfaction of a mortgage because plaintiffs did not allege harms resulting from the failure). For instance, Seagrape does not allege that it was denied the Cash Amount Due because of any recording failure. Nor does the Court find that it can reasonably draw such an inference without more. *See Dane*, 974 F.3d at 188.

As Seagrape fails to establish the injury necessary for constitutional standing, the Court lacks subject matter jurisdiction over its demand for books and records.

### B. Breach of Contract

Seagrape next asserts a breach of contract claim against the OP Defendants, alleging that they violated Sections 5 and 6 of the CSA when they entered into the First Amendment and issued the Credit Line Note and Colombian Pagare. Defendants argue that the doctrine of issue preclusion bars the claim.

To state a claim for breach of contract, a plaintiff must allege "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

The allegations in the Complaint easily satisfy these four elements. First, Seagrape plausibly alleges the existence of a contract—the CSA. Under the CSA, Seagrape agreed to forebear from foreclosing on the Project until a later date. Complaint ¶ 47. In return, the OP Defendants purportedly agreed, among other things, to be "jointly and severally obligated to pay Seagrape the Cash Amount Due [and interest] by" a specified date and to grant Seagrape a first-degree mortgage on the Project. *Id*. ¶¶ 48, 51.  Second, Seagrape allegedly performed its obligation under the contract because it did not foreclose on the Project until after the relevant date. *Id*. ¶ 60–

61.  Third, the OP Defendants allegedly breached Sections 5 and 6 of the CSA. Sections 5 and 6 of the CSA purportedly prohibited the OP Defendants from providing any third party with a security interest in the Project—or otherwise modifying or impairing Seagrape's interest in it—without Seagrape's written consent or its receipt of the Cash Amount Due. *Id*. ¶¶ 51 – 52; 111; *see* Complaint, ex. 4 at 2. The OP Defendants purportedly breached these provisions by entering into the First Amendment and by issuing the Credit Line Note and Colombian Pagare, which provided Innocreative a first mortgage on the Project. Complaint ¶¶ 100, 112. Finally, Seagrape alleges that, as a result of the entry into the First Amendment and notes—supposedly designed to "encumber" Obra Pia with a "huge . . . senior loan," *id*. ¶ 90—it has not received its due payment, *id*. ¶¶ 2, 48, 106.

Nonetheless, the breach of contract claim may not proceed against OP U.S. Feeder. "[U]nder New York law, a party who is not a signatory to a contract generally cannot be held liable for breaches of that contract." *Pentacon BV v. Vanderhaegen*, No. 23-CV-2172, 2024 WL 1255992, at *21 (S.D.N.Y. Mar. 25, 2024), *reconsideration denied*, No. 23-CV-2172, 2024 WL 3835334 (S.D.N.Y. Aug. 15, 2024). Unlike the other OP Defendants, OP U.S. Feeder is not a signatory to the CSA. Complaint, ex. 4 at 4. Nor does Seagrape allege facts indicating that that an exception to the general rule applies. That is, it does not allege facts indicating that OP U.S. Feeder (1) "is the alter ego of [a] signatory," (2) "manifest[ed] an intent to be bound by the contract," or (3) "act[ed] so as to show [it] [is] in privity of contract or assumed obligations under the contract." *Id.*

Relatedly, contrary to Seagrape's allegations, the only remaining OP Defendant to enter into the First Amendment and issue the Credit Line Note was Obra Pia—not all the OP Defendants. Seagrape's claim may nonetheless proceed against all the OP Defendants except OP U.S. Feeder

because they all allegedly issued the Colombian Pagare to Innocreative. While the Court has reviewed a copy of the First Amendment and Credit Line Note, it has not yet been presented with a copy of the Colombian Pagare. At this early stage of litigation, then, it cannot conclude that only Obra Pia breached the CSA. Absent contradictory documentation attached to or incorporated by reference into the Complaint, the Court must "accept as true all factual allegations." *Dane*, 974 F.3d at 188. Seagrape's Complaint thus satisfies the elements necessary for a plausible breach of contract claim against all OP Defendants except OP U.S. Feeder.

Defendants' argument that issue preclusion bars the claim is meritless. "Issue preclusion, also referred to as collateral estoppel, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to a prior judgment." *United States v. Jones*, 43 F.4th 94, 101 (2d Cir. 2022). "A party may invoke issue preclusion only if[] (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party raising the issue had a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Cayuga Nation v. Tanner*, 6 F.4th 361, 374 (2d Cir. 2021).

Defendants maintain that the Court previously concluded in *Seagrape I* that entering into the First Amendment and issuing the Credit Line Note did not violate the CSA.[9] Simply put, the Court did not previously decide the specific issue here: whether the OP Defendants violated Sections 5 *and* 6 of the CSA when they entered into the First Amendment and issued the Credit Line Note *and* Colombian Pagare. In partially granting the motion to dismiss the complaint in

---

[9] The amended complaint in *Seagrape I* alleged that the Court had diversity jurisdiction over the breach of contract claim. The preclusive effect of a judgment rendered by a federal court exercising diversity jurisdiction is determined by the law of the state in which the court sat—here, New York. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). The Court cites to federal case law, however, "[b]ecause there appears to be no significant difference between New York preclusion law and federal preclusion law." *Pike v. Freeman*, 266 F.3d 78, 90 n.14 (2d Cir. 2001).

*Seagrape I*, the Court merely ruled that Seagrape had not plausibly alleged that the OP Defendants violated Section 6 of the CSA "by engaging in a restructuring of the Project, including the injection of new capital, without [Seagrape's] prior notice and consent." *Seagrape Invs. LLC*, 2020 WL 5751232, at *19 . The prior complaint included no allegations about the First Amendment, Credit Line Note, Colombian Pagare, or Section 5 of the CSA.

It is true that Seagrape later argued that the OP Defendants breached Section 6 of the CSA by issuing the Credit Line Note. In briefing its motion for summary judgment, Seagrape asked the Court to revive its breach of contract claim arising from the restructuring of the Project. Reply Memorandum of Law at 6, *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736 (S.D.N.Y. June 25, 2021). The Court declined to do so. It explained that the application for revival was "not appropriate in a reply brief on a motion for judgment" and that revival was not "warranted." Transcript 28:1–3, *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736 (Sept. 23, 2022), Dkt. 170. The latter observation was not "necessary to support a valid and final judgment on the merits"— even if one construes it to mean that revival was unwarranted *because* the new allegations were inadequate to state a claim. *Cayuga Nation*, 6 F.4th at 374.

Defendants' issue preclusion argument also relies on the Court's later rejection of any argument that the First Amendment was invalid because Seagrape did not agree to subordinate its due repayment to Innocreative's due repayment. *See Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736, 2023 WL 4764022, at *3 n.4 (S.D.N.Y. July 26, 2023). However, the Court reached this conclusion based on the observation that the "plain terms of the Subordination Agreement" permitted the modification of the "bridge loan"—not any observations about Sections 5 and 6 of the CSA. *Id*. at 3; *see id.* at 3 n.4. Stated differently, the Court did not evaluate whether the First Amendment was consistent with Sections 5 and 6 of the CSA, which is the issue here. The issues

are thus not "identical," and the doctrine of issue preclusion does not apply. *Cayuga Nation*, 6 F.4th at 374.

Seagrape's claim for breach of contract accordingly survives Defendants' motion to dismiss as to all OP Defendants except OP U.S. Feeder.

### C. Tortious Interference with Contract

Seagrape's third claim is one against the Singer Defendants—Singer, the Singer Trust, and Innocreative—for tortious interference with contract. Defendants argue that the "economic interest defense" and issue preclusion bar the claim.

"Under New York law, a plaintiff claiming tortious interference with contract must plead (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Regeneron Pharms., Inc.*, 96 F.4th at 343. "Additionally, the plaintiff must allege [(6)] that the contract would not have been breached but for the defendant's conduct." *Id*.

Seagrape's Complaint satisfies the first, fourth, and fifth elements of a tortious interference claim for much the same reasons described above. Under the CSA, Seagrape allegedly agreed to forebear from foreclosing on the Project until a later date. In turn, the OP Defendants (save OP U.S. Feeder) agreed to be "jointly and severally obligated to pay Seagrape the Cash Amount Due [and interest] by" a specified date and to grant Seagrape a first-degree mortgage on the Project. Complaint ¶¶ 48, 51. Entry into the First Amendment and issuance of the Credit Line Note and the Colombian Pagare then purportedly breached Sections 5 and 6 of the CSA. And, allegedly as a result, Seagrape has not received its due payment. *Id.* ¶¶ 2, 48, 106.

Seagrape further alleges the second and sixth elements of a tortious interference claim: knowledge and but-for causation. The Singer Defendants allegedly knew of the contract because they had received copies of it. *Id.* ¶ 91. And while Seagrape does not use the term "but-for causation," it alleges facts that permit the Court to reasonably infer it. Obra Pia and/or OP U.S. Feeder allegedly entered into the First Amendment and issued the Credit Line Note at the "behest" of the Singer Defendants. *Id.* ¶¶ 5, 90, 100. Doing so, moreover, allegedly benefitted Innocreative by enabling it "to continue funding frivolous litigation against Seagrape," *id.* ¶ 90, and "obtain a . . . senior secured position for the repayment of a substantial litigation loan," *id.* ¶ 117.

A more involved question is whether Seagrape's Complaint satisfies the remaining third element of a plausible tortious interference claim—"the defendant's intentional procurement of the third-party's breach of the contract *without justification*." *Regeneron Pharms., Inc.*, 96 F.4th at 343 (emphasis added). To determine whether a defendant intentionally procured a breach without justification, courts apply "the approach set forth in the Restatement (Second) of Torts § 767" by balancing numerous factors. *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of New York, Inc.*, 968 F.2d 286, 292 (2d Cir. 1992); *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996). These factors include (1) "the nature of the defendant's conduct" (2) "the defendant's motive," (3) "the interests of the plaintiff with which the defendant interferes," (4) "the interests the defendant seeks to advance," (5) "the social interests at stake," (6) "the proximity of the defendant's conduct to the interference," and (7) "the relations between the parties." *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996); *see Jews for Jesus, Inc.*, 968 F.2d at 292.

Considering these factors, Seagrape plausibly alleges that the Singer Defendants' interference was "without justification." *Regeneron Pharms., Inc.*, 96 F.4th at 343. The "nature,"

24

*Int'l Mins. & Res., S.A.*, 96 F.3d at 595, of Innocreative's conduct with respect to the First Amendment and Credit Line Note was allegedly unlawful in that, as discussed below, Innocreative fraudulently conveyed a lien on the Project. *See* Restatement (Second) of Torts § 767 cmt. c (Am. L. Inst. 1979) ("Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper."). The Court may also reasonably infer that the Singer Defendants' "motive," *Int'l Mins. & Res., S.A.*, 96 F.3d at 595, was to interfere with the CSA between Seagrape and the relevant OP Defendants, *see* Restatement (Second) of Torts § 767 cmt. d, because they purportedly knew about the CSA, Complaint ¶ 91, and Innocreative—of which the Singer Trust is a member, *id.* ¶ 12—stood to benefit from the First Amendment and Credit Line Note, *id.* ¶ 124. In addition, Seagrape's "interests," *Int'l Mins. & Res., S.A.*, 96 F.3d at 595, in the CSA were significant in that the CSA was a purportedly valid, existing contract. Relatedly, there is a social interest in ensuring the integrity of an existing contract that does not violate public policy; by contrast, conduct of an unlawful nature is inconsistent with social interests. *Cf.* Restatement (Second) of Torts § 767 cmts. c, e. On the facts alleged, moreover, the Singer Defendants' conduct was "proximat[e]" to the interference. *Int'l Mins. & Res., S.A.*, 96 F.3d at 595. The breach occurred at the "behest" of the Singer Defendants, Complaint ¶¶ 5, 90, 100, meaning the "[t]he interference [wa]s an immediate consequence of the conduct," Restatement (Second) of Torts § 767 cmt. h.

Defendants' argument that the "economic interest defense" bars Seagrape's claim is unpersuasive. The "economic interest" defense applies where a defendant "acted to protect its own legal or financial stake in the breaching party's business," including where the "defendant was the breaching party's creditor." *White Plains Coat & Apron Co. v. Cintas Corp.*, 867 N.E.2d 381, 383–84 (N.Y. 2007). While a defendant may not typically raise an affirmative defense in a motion to

dismiss, a defendant may raise the "economic interest" defense "if the defense appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). If it does, the plaintiff must allege that the defendant acted with "malice" or "employed illegal means to safeguard its interest." *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996); *see Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019) (observing in the context of a Rule 12(b)(6) motion that "the pursuit of 'economic interest' can suffice [to defeat a claim]—unless there is a showing of malice or illegality").

The "economic interest defense" appears on the face of the Complaint as to Innocreative because—by virtue of the First and Second Litigation Loans—it was a creditor of Obra Pia when the breaches occurred.[10] Seagrape, nevertheless, overcomes the defense because it alleges facts indicating that Innocreative "employed illegal means to safeguard its interest." *Foster*, 665 N.E.2d at 156. As discussed below, Innocreative allegedly engaged in a fraudulent conveyance when it entered into the First Amendment. The "economic interest defense" thus does not bar Seagrape's claim for tortious interference with contract.

Nor does the doctrine of issue preclusion. As described above, "[a] party may invoke issue preclusion only if . . . the issue was actually litigated and decided in the previous proceeding." *Cayuga Nation*, 6 F.4th at 374. Defendants maintain that the Court decided in *Seagrape I* that no breach of contract—an essential element of a claim for tortious interference with contract— occurred. The Court, however, has already rejected the same issue preclusion argument in the context of Seagrape's breach of contract claim. The reasoning applies with equal force here. In

---

[10] Although the Singer Trust loaned money to Obra Pia through the Second Litigation Loan, it assigned the loan to Innocreative before the execution of the First Amendment and Credit Line Note. Complaint ¶ 82; Tuzman Declaration, ex. 5 at 2.

*Seagrape I*, the Court did not decide whether any OP Defendant breached Sections 5 and 6 of the CSA by entering into the First Amendment or issuing the Credit Line Note and Colombian Pagare.

In sum, Seagrape's claim for tortious interference with contract survives Defendants' motion to dismiss.

### D. Fraudulent Conveyance

Seagrape next asserts claims for actual and constructive fraudulent conveyance against all defendants based on the Litigations Loans, First Amendment, and Credit Line Note.[11] *See* N.Y. Debt. & Cred. §§ 273, 276 (repealed Dec. 6, 2019)[12]; *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 400 (S.D.N.Y. 2015), *aff'd*, 716 F. App'x 23 (2d Cir. 2017). It seeks an avoidance of all conveyances or obligations; an injunction; the appointment of a receiver; and, under former New York Debtor and Creditor Law ("DCL") § 276-a, attorneys' fees and costs. *See* N.Y. Debt. & Cred. §§ 278–79 (repealed Dec. 6, 2019). Defendants argue that the doctrine of issue preclusion bars the claim under former § 276 and that Seagrape fails to plausibly allege the absence of fair consideration necessary for a claim under former § 273.

### 1. Former New York Debt and Credit Law § 276

Former DCL § 276 provides: "Every conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. §276 (repealed Dec. 6, 2019). Accordingly, to state a plausible claim under former § 276, a plaintiff must allege (1) a conveyance made or

---

[11] Seagrape does not allege that its claims for fraudulent conveyance rely on the Colombian Pagare. The Court's analysis of Seagrape's fraudulent conveyance claims thus does not consider the effect of the Colombian Pagare.

[12] The sections of the of the New York Debtor and Creditor Law relevant to this suit "have been repealed and replaced—effective April 4, 2020—by an act of the New York legislature approved on December 6, 2019." *Ray v. Ray*, 799 F. App'x 29, 31 (2d Cir. 2020) (summary order). The new provisions, however, do "not apply to a transfer made or obligation incurred before the act's effective date, nor shall they apply to a right of action that has accrued before [that] effective date." *Id*. Because Seagrape's cause of action arose before the new legislation became effective, the earlier versions of the New York Debtor and Creditor Law apply.

obligation incurred (2) with the actual intent to hinder, delay, or defraud creditors. *See Aurelius Cap. Master, Inc. v. MBIA Ins. Corp.*, 695 F. Supp. 2d 68, 76 (S.D.N.Y. 2010); *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 797–98 (S.D.N.Y. 2017); *Cadle Co. v. Newhouse*, No. 01-CV-1777, 2002 WL 1888716, at *6 (S.D.N.Y. Aug. 16, 2002), *aff'd*, 74 F. App'x 152 (2d Cir. 2003).

Relevant to the first element, a fraudulent conveyance claim may generally only proceed against transferees and beneficiaries who participate in the conveyance—and not transferors. *See Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 309–10 (S.D.N.Y. 2005); *Amusement Indus., Inc. v. Midland Ave. Assocs.*, LLC, 820 F. Supp. 2d 510, 527, 532 (S.D.N.Y. 2011)*; see also Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993) (explaining that a creditor may seek "money damages against parties who participate in the fraudulent transfer of a debtor's property and are transferees of the assets and beneficiaries of the conveyance"); *City of Almaty v. Ablyazov*, No. 15-CV-5345, 2019 WL 4747654, at *4 (S.D.N.Y. Sept. 30, 2019) (explaining that "a money judgment may only be granted in lieu of setting aside the conveyance if the transferee has disposed of the wrongfully conveyed property in some manner which makes it impossible to return"). *See generally* Who Can Be Sued for Fraudulent Transfer, New York Practice Series § 129:19 (5th ed. 2023). The reason is that the "purpose" of a fraudulent transfer claim is "to force the debtor to recover property transferred for inadequate consideration so that the property can be used to satisfy the debt owed to the creditor." *Grace v. Bank Leumi Tr. Co. of NY*, 443 F.3d 180, 189 (2d Cir. 2006). A creditor's remedy is thus "limited to reaching the property which would have been available to satisfy the [debt] had there been no conveyance." *Id.* Nonetheless, a fraudulent conveyance claim may also lie against a transferor at least where, as here, the plaintiff seeks an injunction. *See, e.g.*, *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 926 (E.D.N.Y. 1999); *Galleon Syndicate Corp. v. Pan Atl. Group, Inc.*, 637

N.Y.S.2d 104, 105–06 (1st Dep't 1996); *see also Sullivan,* 373 F. Supp. 2d at 304, 311 (permitting a claim against a transferor to proceed where plaintiff sought an injunction).

As to the second element, a plaintiff must also "plead the requisite mental state with particularity" as required under Federal Rule of Civil Procedure 9(b). *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 251 (2d Cir. 1987). That is, "the facts supporting general allegations of [an] actual intent to hinder, delay, or defraud must be pled with specificity." *Ray*, 799 F. Appx at 31. A plaintiff may do so by "rely[ing] on badges of fraud," which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *In re Sharp Intl Corp.*, 403 F.3d 43, 56 (2d Cir. 2005); *see Ray*, 799 F. Appx at 31. They may include

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*In re TransCare Corp.*, 81 F.4th 37, 54 (2d Cir. 2023); *see Ray*, 799 F. App'x at 32.

### a.  Conveyance or Obligation Incurred

Seagrape's Complaint satisfies the first element of an actual fraudulent claim because it identifies "conveyance[s] made" and "obligation[s] incurred." N.Y. Debt. & Cred. § 276 (repealed Dec. 6, 2019). Innocreative and the Singer Trust purportedly loaned money to Obra Pia through the First and Second Litigation Loans; Obra Pia incurred, among other things, a corresponding repayment obligation. Complaint ¶ 68. In addition, Obra Pia and OP U.S. Feeder purportedly conveyed a lien on the Project to Innocreative through the First Amendment. *Id*. ¶ 5; Tuzman Declaration, ex. 5 at 4. Innocreative, meanwhile, incurred the related obligation to loan Obra Pia

up to $5 million, and Obra Pia incurred a repayment obligation.[13] Complaint ¶¶ 2, 95, 100; Tuzman Declaration, ex. 5 at 3–4; *see* N.Y. Debt. & Cred. § 270 (repealed Dec. 6, 2019) (defining "conveyance" to include "the creation of any lien or incumbrance"); *cf. Rubin v. Manufacturers Hanover Trust Co*., 661 F.2d 979, 990 (2d Cir. 1981) (observing that, in the context of a similar bankruptcy provision, obligations incurred can be contingent). Stated differently, Obra Pia, OP U.S. Feeder, Innocreative, and the Singer Trust are either transferors or transferees.

Accordingly, the claim may proceed against Obra Pia, OP U.S. Feeder, Innocreative, and the Singer Trust. It may not, however, proceed against any other defendant. As noted, beyond transferees (and, in some instances, transferors), a claim for fraudulent conveyance generally lies only against participating beneficiaries. *See Sullivan*, 373 F. Supp. 2d at 309–10. Seagrape does not allege that any party other than Innocreative, the Singer Trust, and Obra Pia participated in transferring funds through the Litigations Loans. Nor does it allege that any party other than Innocreative benefitted from the conveyance of the lien on the Project.

Under New York law, a person or entity does not benefit from a conveyance if the benefit is "too attenuated." *Roselink Invs., L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 227 (S.D.N.Y. 2004). Courts have thus viewed as beneficiaries, for example, individuals who (1) used transferred funds for their own "personal benefit," *Stochastic Decisions, Inc.*, 995 F.2d at 1172; (2) were beneficiaries of trusts to which funds are transferred, *see Sullivan*, 373 F. Supp. 2d at 309–10; or (3) were the recipients of life insurance money, *see McCarthy v. Est. of McCarthy*, 145 F. Supp. 3d 278, 280, 287 (S.D.N.Y. 2015). By contrast, they have observed that an individual's "generalized interest" in a transferee's financial health does not render him a beneficiary. *Geo-Grp. Commc'ns, Inc. v. Chopra*, No. 15-CV-1756, 2018 WL 3632498, at *12 n.11 (S.D.N.Y. July

---

[13] Seagrape does not allege that Innocreative actually loaned any of the $5 million it bore an obligation to loan.

30, 2018); *see also Brenner v. Philips, Appel & Walden, Inc.*, 1997 WL 33471053 at \*1, \*5 (S.D.N.Y. July 22, 1997) (rejecting a fraudulent transfer claim against an individual who owned more than a third of a transferee company); *Roselink Invs.*, 386 F. Supp. 2d at 227 (concluding that that a defendant was not a beneficiary where he owned "some unspecified [indirect] ownership interest" in a party to the transfer). Any interest the remaining defendants had in the lien on the Project is far more akin to an insufficient "generalized interest," *Geo-Grp. Commc'ns, Inc.*, 2018 WL 3632498, at \*12 n.11, in Innocreative's financial health than it is to the benefits in *Stochastic Decisions, Inc.*, *Sullivan*, or *McCarthy*.

### b. Intent

Seagrape's Complaint also satisfies the second element of a plausible claim as to Obra Pia, OP U.S. Feeder, Innocreative, and the Singer Trust. It alleges that the parties entered the agreements and issued the Credit Line Note with the "*actual intent to hinder, delay, and defraud* Seagrape's recovery of the Cash Amount Due under the CSA." Complaint ¶ 122 (emphasis added). They purportedly entered into the agreements with "full knowledge" that Seagrape demanded repayment and had commenced the proceeding in Colombia. *Id.* ¶ 121. They nonetheless "arranged to siphon off all or nearly all of the equity in the Project" to "leave little or no equity to satisfy" Seagrape's claim. *Id.* ¶ 124. Obra Pia, with the Singer Trust's and Innocreative's assistance, *id.* ¶¶ 82, 130, also filed suit in New York to "block" Seagrape's recovery, ¶ 1; *see* ¶ 7.

The Complaint, moreover, satisfies the heightened pleading requirement of Rule 9(b) because it alleges several "badges of fraud." *In re Sharp Int'l Corp.*, 403 F.3d at 56. Seagrape alleges a "close associate relationship between the parties," *In re TransCare Corp.*, 81 F.4th at 54, in that the Singer Trust and Innocreative "were insiders in connection with the Project . . . with the ability to influence the conduct of [Obra Pia and OP U.S. Feeder]." Complaint ¶ 120; *see In re*

*Trib. Co. Fraudulent Conv. Litig.*, No. 11-MD-2296, 2017 WL 82391, at \*13 (S.D.N.Y. Jan. 6, 2017), *aff'd*, 10 F.4th 147 (2d Cir. 2021) (observing that "the claim that an allegedly fraudulent transfer was made to an insider . . . can support an inference of fraudulent intent"); *Watson v. Riptide Worldwide, Inc.*, No. 11-CV-874, 2012 WL 383946, at \*9 (S.D.N.Y. Feb. 7, 2012) (observing that parties' status as "corporate insiders" was a "badge of fraud"). It also alleges that Obra Pia was in poor "financial condition," *In re TransCare Corp.*, 81 F.4th at 54, when the last transfer occurred: It "grant[ed] Innocreative a $5 million . . . first lien on the Project" while "insolvent." Complaint ¶ 5. Seagrape further asserts a "course of conduct after the incurring of debt" and "threat of suit[]" that are indicative of fraud. *In re TransCare Corp.*, 81 F.4th at 54. After Seagrape commenced the proceeding in Colombia and served a statutory demand on Obra Pia, Complaint ¶¶ 62–63, Obra Pia, OP  U.S. Feeder, Innocreative, and the Singer Trust allegedly worked together, including by entering into agreements, to prevent Seagrape from recovering the Cash Amount Due, *id.* ¶ 122, 124. Defendants also purportedly worked together to block Seagrape's recovery by suing Seagrape in the British Virgin Islands and New York. *Id.* ¶¶ 7, 79, 134.[14]

Finally, Defendants' argument about issue preclusion once again carries no weight. Defendants contend that Seagrape fails to allege intent because the Court concluded in *Seagrape I* that the Credit Line Note replaced Seagrape's $1.5 million "bridge loan." While the Court did

---

[14] Some courts have determined whether a plaintiff has complied with Rule 9(b) by assessing whether the plaintiff alleges "(1) the property subject to the transfer, (2) timing of the transfer, and (3) the consideration." *E.g.*, *In re Nine W. LBO Sec. Litig.*, 505 F. Supp. 3d 292, 320 (S.D.N.Y. 2020). To the extent the Court were to adopt this approach to evaluating an actual fraudulent conveyance claim, Seagrape would satisfy it. As to the First Litigation Loan, executed on January 21, 2019, Innocreative loaned $10,000 to Obra Pia, which incurred the obligation to, for example, repay twice that amount. Complaint ¶¶ 65, 68. As to the Second Litigation Loan, executed on July 11, 2019, the Singer Trust conveyed $98,000 to Obra Pia, which bore an obligation to repay the loan. *Id.* ¶ 82. As to the First Amendment and Credit Line Note, executed on October 13, 2019, Obra Pia and OP U.S. Feeder granted Innocreative a $5 million lien on the Project in exchange for a loan of up to $5 million. Complaint ¶¶ 2, 95, 100; Tuzman Declaration, ex. 5 at 3–4; Tuzman Declaration, ex. 6 at 1–2.

determine that the Credit Line Note replaced the "bridge loan," *see Seagrape I*, 2023 WL 4764022, at *3, that conclusion is wholly dissimilar from the issue here: whether Defendants made conveyances or incurred obligations "with the actual intent to hinder, delay, and defraud" Seagrape with regard to its due recovery. N.Y. Debt. & Cred. §276 (repealed Dec. 6, 2019).

Seagrape's claim for actual fraudulent conveyance under former DCL § 276 thus survives Defendants' motion to dismiss as to Obra Pia, OP U.S. Feeder, the Singer Trust, and Innocreative. Accordingly, so does the corresponding claim for attorneys' fees under former DCL § 276-a. *See* DCL § 276-a (providing that a debtor and transferee must pay attorneys' fees in the case of an actual fraudulent transfer).

### 2. Former New York Debt and Credit Law § 273

Seagrape's claim for constructive fraudulent conveyance under former DCL § 273 likewise survives, but only as to Obra Pia.

Former DCL § 273 provides: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. & Cred. § 273 (repealed Dec. 6, 2019). Unlike former DCL § 276, which applies to both present and future creditors, former DCL § 273 applies only to the former— that is, creditors of the transferor at the time the transfer occurred. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 465 (S.D.N.Y. 2018) (collecting cases). Thus, to state a plausible claim under former § 273, a present creditor must allege "(1) a conveyance [or obligation incurred] (2) without fair consideration (3) by a person who is insolvent or who becomes insolvent as a consequence of the transfer [or obligation incurred]." *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). A constructive

fraudulent conveyance claim, as compared to an actual fraudulent conveyance claim, does not require a plaintiff to comply with the heightened pleading requirement of Rule 9(b). *See Tutor Perini Bldg. Corp. v. N.Y.C. Reg'l Ctr., LLC*, 525 F. Supp. 3d 482, 516 n.20 (S.D.N.Y. 2021).

Here, the final element is the most straightforward. Seagrape alleges that the OP Defendants—but not the Singer Defendants—either were or became insolvent as a result of their conveyances or obligations incurred through the First Litigation Loan, Second Litigation Loan, First Amendment, and Credit Line Note. Complaint ¶¶ 123, 125. Seagrape's allegations only satisfy the third element as to Obra Pia and OP U.S. Feeder, however, because they were the only ones to make conveyances or incur obligations. As noted, Obra Pia and OP U.S. Feeder purportedly conveyed a lien on the Project to Innocreative through the First Amendment; Obra Pia, meanwhile, incurred payment obligations through Litigation Loans and the Credit Line Note. Complaint ¶¶ 2, 95, 100; Tuzman Declaration, ex. 5 at 3, 4.

While the Complaint satisfies the third element as to both Obra Pia and OP U.S. Feeder, the claim nonetheless may not proceed against OP U.S. Feeder. Seagrape does not allege that it was a creditor of OP U.S. Feeder at the time it entered into the First Amendment. *See DoubleLine Cap. LP*, 323 F. Supp. 3d at 465 (S.D.N.Y. 2018). Obra Pia was indebted to Seagrape under the CSA years before the execution of the Litigations Loans, the First Amendment, and Credit Line Note. By contrast, OP U.S. Feeder is not a party to the CSA and there is no plausible allegation that it was otherwise indebted to Seagrape by the time the alleged fraudulent transfers occurred.

Seagrape's allegations satisfy the remaining elements of a constructive fraudulent conveyance as to Obra Pia. As to the first element—conveyances made or obligations incurred—Obra Pia, as noted, incurred payment obligations through the First and Second Litigation Loans.

It also incurred a payment obligation of up to $5 million through the Credit Line Note. Tuzman Declaration, ex. 5 at 3, 4; *id*. ex. 6 at 1–2.

As to the second element—lack of consideration—Defendants contend that the claim fails because cash was received in exchange for a security interest in the Project. The Court is unpersuaded. Under former DCL § 272,

> Fair consideration is given for property, or obligation,
>
>> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in *good faith*, property is conveyed or an antecedent debt is satisfied, or
>>
>> b. When such property, or obligation is received *in good faith* to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. Debt. & Cred. § 272 (repealed Dec. 6, 2019) (emphases added); *see In re Sharp Int'l Corp.*, 403 F.3d at 53–54. And a lack of good faith may exist where "there is knowledge of the fact that the activities in question will hinder, delay, or defraud others." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 448 (S.D.N.Y. 2014); *see HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995); *Staudinger+Franke GMBH v. Casey*, No. 13-CV-6124, 2015 WL 3561409, at *10 (S.D.N.Y. June 8, 2015). Seagrape plausibly alleges such knowledge because it alleges that Obra Pia intended to "hinder, delay, or defraud" it as to its recovery. Complaint ¶ 122. As noted, Obra Pia purportedly "entered into the [First] Litigation Loan, Second Litigation Loan, First Amendment and Credit Line Notes . . . with the actual intent to hinder, delay and defraud Seagrape's recovery of the Cash Amount Due under the CSA." *Id*.

Seagrape's claim against Obra Pia for constructive fraudulent conveyance under former DCL § 273 thus survives Defendants' motion to dismiss.

### E. Malicious Prosecution

Seagrape lastly asserts a claim for malicious prosecution against all the defendants. In response, Defendants argue that issue preclusion bars Seagrape from establishing two requisite elements of its claim—malice and special injury—and that it otherwise fails to plausibly allege another—lack of probable cause.

A malicious prosecution claim survives a motion to dismiss where the plaintiff alleges that the defendant (1) initiated or continued an action against it, (2) with malice and (3) without probable cause, (4) that terminated in its favor. *See Fulton*, 289 F.3d at 195; *Engel*, 145 F.3d at 502. "In addition," where, as here, "the proceeding of which plaintiff complains was a civil action," the plaintiff must plausibly allege (5) "special injury"—that is, "some interference with the plaintiff's person or property . . . beyond the ordinary burden of defending a lawsuit." *Engel*, 145 F.3d at 502.

Seagrape's Complaint satisfies the first element of a malicious prosecution claim as to all defendants except OP Colombia and OP Management. On June 24, 2019, the OP Defendants— save the two just mentioned—"initiat[ed]," *Engel*, 145 F.3d at 502, suit against Seagrape, asserting numerous claims, including one for breach of contract related to the Subordination Agreement. Complaint ¶ 79; *Obra Pia* Complaint, *Obra Pia Ltd. v. Seagrape Investors LLC*, No. 19-CV-7840 (S.D.N.Y. Aug. 21, 2019). While the Signer Defendants were not parties to that action, the allegations about them suffice because they allegedly "played an active role in the prosecution, such as giving advice and encouragement." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000). According to Seagrape, the Singer Defendants "fund[ed] and direct[ed]" the suit. Complaint ¶ 129. They purportedly "select[ed] the OP Defendants' counsel and approv[ed] and pa[id] all legal bills." *Id.* ¶ 130. Both Innocreative and the Singer Trust allegedly financed the

36

suit. *Id.* ¶¶ 72, 82, 84. Innocreative and Singer, moreover, purportedly "(a) participated in litigation strategy; (b) referred [Obra Pia] its choice of counsel, [MR]; and (c) reviewed, approved and paid bills submitted by MR to the OP Defendants." *Id.* ¶ 71. By contrast, Seagrape fails to allege or specify OP Colombia's and OP Management's "active role in the prosecution," and, thus, the claim may not proceed against them. *Rohman*, 215 F.3d at 217.

As to the remaining defendants, Seagrape also alleges malice. A prosecution is "begun with malice," *Engel*, 145 F.3d at 502, where the plaintiff has "a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d at 573 (2d Cir. 1996); *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994); *see also Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) ("[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff."). Under the facts alleged, the "desire to see the ends of justice served" did not motivate the June 2019 suit. *Lowth*, 82 F.3d at 573. Rather, the remaining defendants were motivated by the desire to "block [the] liquidation of [Obra Pia]," Complaint ¶ 79 and, in turn, Seagrape's "*due* recovery," *id.* ¶ 7 (emphasis added). In addition, as explained below, the allegations indicate that the relevant OP Defendants initiated suit without "probable cause," which "generally creates an inference of malice." *Manganiello*, 612 F.3d at 163.

Defendants' argument that the doctrine of issue preclusion applies to the element of malice is wholly unpersuasive. They observe that the Court decided in *Seagrape I* that Seagrape's right to payment from Obra Pia remained subordinated under the Subordination Agreement. *Seagrape Invs. LLC v. Tuzman*, No. 19-CV-9736, 2023 WL 4764022, at *5 (S.D.N.Y. July 26, 2023). Simply stated, that is not the issue here: whether Defendants began the June 2019 suit with malice. *See*

*Cayuga Nation*, 6 F.4th at 374 ("A party may invoke issue preclusion only if . . . the issue was actually litigated and decided in the previous proceeding.").

Seagrape also alleges lack of probable cause, except as to the Singer Defendants. *See Fulton*, 289 F.3d at 195. A plaintiff lacks probable cause when initiating suit without "knowledge of facts, actual or apparent, strong enough to justify a reasonable [person] in the belief that [s]he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994). Additionally, "when the underlying action is civil in nature, the want of probable cause must be patent." *Kurtz v. Hansell*, 664 F. Supp. 3d 438, 452 (S.D.N.Y. 2023).

The *Obra Pia* Plaintiffs—with other Defendants' help—allegedly filed suit under the false premise that Seagrape had not provided written notice to the Project's potential buyer before issuing its statutory demand. Complaint ¶¶ 129, 133. But Seagrape does not allege that the Singer Defendants knew the premise to be false at the time of filing. It alleges only that the OP Defendants had been copied on the email through which Seagrape served notice. *Id.* ¶ 4. The allegation that Defendants continued the suit under the false premise that the Subordination Agreement remained in effect, moreover, is implausible. In *Seagrape I*, the Court ruled that  Seagrape's right to payment from Obra Pia remained subordinated under the Subordination Agreement. *Seagrape Invs. LLC v. Tuzman*, 2023 WL 4764022, at *5. Seagrape thus plausibly alleges a lack of probable cause as to the remaining OP Defendants but not the Singer Defendants, against whom the claim may not proceed.

The Complaint easily satisfies the remaining elements—termination of the suit in the plaintiff's favor and special injury—as to the remaining OP Defendants. *See Fulton*, 289 F.3d at 195; *Engel*, 145 F.3d at 502. The Court granted Seagrape's motion to dismiss the *Obra Pia*

Plaintiffs' complaint for failure to state a claim in September 2020. *Obra Pia Ltd.*, 2020 WL 5751195, at \*19. In addition, according to the Complaint here, the *Obra Pia* Plaintiffs' suit prevented Seagrape from obtaining "over \$13 million," Complaint ¶ 7, including the Cash Amount Due and "the value of Seagrape's limited partnership units in OP Feeder," *id.* ¶ 134. Further, contrary to Defendants' argument, the doctrine of issue preclusion simply does not apply here. At no point did the Court decide that Seagrape did not incur such damages. In fact, the Court previously awarded Seagrape the Cash Amount Due. *Seagrape Invs. LLC*, 2023 WL 4764022, at \*5.

Seagrape's claim for malicious prosecution thus survives Defendants' motion to dismiss as to the OP Defendants, save OP Colombia and OP Management.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Seagrape's Complaint is granted in part and denied in part. The following claims may proceed against the following Defendants:

- The breach of contract claim against the OP Defendants, except OP U.S. Feeder;

- The tortious interference with contract claim against all Singer Defendants;

- The actual fraudulent conveyance claim against Obra Pia, OP U.S. Feeder, Innocreative, and the Singer Trust, as well as the corresponding claim for attorneys' fees;

- The constructive fraudulent conveyance claim against Obra Pia; and

- The malicious prosecution claim against the OP Defendants, except OP Colombia and OP Management.

The demand for books and records is dismissed in its entirety.

Seagrape shall have 30 days to amend its Complaint, provided it has a good faith basis for doing so. *See, e.g.*, *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008); *see also* Fed. R. Civ. P. 15(a)(2) (instructing that "[t]he court should freely give leave [to amend] when

justice so requires"); *Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011) (describing Rule 15(a)(2) as "permissive"). Should it do so, Seagrape is advised that the Court may impose sanctions under Federal Rule of Civil Procedure 11(b)(3) or 28 U.S.C. § 1927 if its allegations are not made in good faith or it again alleges that entire groups of defendants executed agreements or filed suit where the documentary evidence indicates that only some members of the group did so.

The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 54 and 61.

Dated:    September 26, 2024
          New York, New York

Ronnie Abrams
United States District Judge